IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MAIN STREET AMERICA ASSURANCE
COMPANY,

                    Plaintiff,

     v.

CONNOLLY CONTRACTORS, INC., et al.,

                    Defendants.

CIVIL ACTION
NO. 19-4241

## OPINION

**Slomsky, J.**                                                                                   **February 28, 2022**

## TABLE OF CONTENTS

I.      **INTRODUCTION** ...................................................................................................1

II.    **BACKGROUND** ....................................................................................................1

     A.    **Underlying Actions** ..................................................................................1

          1.    Galarneau Claims ..........................................................................2

          2.    Joinder Action ...............................................................................3

          3.    Campbell Claim .............................................................................5

          4.    Plick Claim ...................................................................................5

          5.    Subsequent Claims and Joinder Actions......................................6

     B.    **Insurance Policies** ....................................................................................6

          1.    Businessowners Policies................................................................6

          2.    Umbrella Policies ........................................................................10

     C.    **Claims for Coverage** ............................................................................. 11

     D.    **Present Action** ........................................................................................12

III.   STANDARDS OF REVIEW ............................................................................ 13

    A.   **Judgment on the Pleadings** ..............................................................13

    B.   **Insurance Policy Interpretation** ..........................................................14

    C.   **Insurer's Duty to Defend** ..............................................................14

    D.   **Insurer's Duty to Indemnify** ..........................................................15

IV.   ANALYSIS ................................................................................................ 15

    A.   **Main Street Has No Duty to Defend Connolly Contractors
        or Glenn White** ..................................................................... 15

        1.   Definition of "Occurrence" ....................................... 16

        2.   Underlying Actions Do Not Allege an "Occurrence" ..............21

        3.   There is No Duty to Defend Under the Insurance Policies ....................25

        4.   Glenn White Does Not Qualify as an Additional Insured ........................28

    B.   **Main Street Has No Duty to Indemnify Either Party** .......................30

    C.   **Main Street's Defense Costs** ..........................................................30

V.   CONCLUSION ........................................................................................ 31

## I.      INTRODUCTION

This case is a declaratory judgment action filed by an insurer, Plaintiff Main Street America Assurance Company ("Main Street"), to determine if it has a duty under certain commercial insurance policies to defend or indemnify Defendants Connolly Contractors, Inc. ("Connolly Contractors") and Glenn M. White Builders, Inc. ("Glenn White").  The case arises from a series of actions filed against Glenn White by homeowners who claimed their houses were defectively built.  Glenn White was the general contractor for the Brickhouse Farms homes project (the "Project").  Connolly Contractors is the named successor-in-interest to a subcontractor retained by Glenn White to install stucco on the houses.  After the claims were filed against Glenn White, it filed joinder actions against Connolly Contractors seeking to impose a contractually required defense, contribution, and indemnification in the event that Glenn White was liable.  Thereafter, both Glenn White and Connolly Contractors requested Main Street to defend and indemnify them in these actions under the insurance policies.  Main Street then brought the instant case pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking a declaration that it has no duty to defend or indemnify Defendants under the insurance policies.

Before the Court is Plaintiff's Motion for Judgment on the Pleadings.  In the Motion, Plaintiff seeks a declaratory judgment that it is not obligated to provide defense or indemnity coverage under the insurance policies to Defendants.  For reasons discussed infra, Plaintiff's claim has merit and the Motion for Judgment on the Pleadings will be granted.

## II.     BACKGROUND

### A.      Underlying Actions

This case arises from damage to houses caused by moisture penetration due to faulty construction and involves (1) claims filed by homeowners against Defendant Glenn White,

1

alleging damage to their individual properties; and (2) Joinder Actions filed by Defendant Glenn White against Defendant Connolly Contractors.  Because the claims in these underlying actions determine whether coverage exists under the relevant insurance policies, the Court will summarize each action in turn.

### 1.    Galarneau Claims

On September 4, 2018, five homeowners in the Brickhouse Farms development in Newtown Square, Pennsylvania, filed arbitration proceedings (the "Galarneau Claims") with the American Arbitration Association ("AAA") against Defendant Glenn White.[1]  (See Doc. No. 25-1 at 24.)  In the AAA proceeding, the homeowners identified Glenn White as "the general contractor for the project" to build their homes.  (Id.; see also Doc. No. 25-11.)  The homeowners "alleged that they purchased their respective properties . . . 'as a direct result of [Glenn White's] marketing materials and other representations related to the quality of the Property.'"  (Doc. No. 25-1 at 24; Doc. No. 25-11.)

Each homeowner attributed the common issue with their homes—moisture penetration— to "pervasive defects in the construction of the Property," and alleged that these construction failures had damaged their homes.  (Doc. No. 25-1 at 24.)  The Galarneau claimants based this conclusion on the findings of an expert who examined their homes and found construction defects.  The expert "discovered that the labor and materials provided by [Glenn White] and [its] subcontractors did not comply with federal, state, and local building codes, industry standards, the aforementioned marketing materials, written contracts, and warranties."  (Doc. No. 25-11 at 5, 10, 16, 22, 28.)  The Galarneau Claims asserted against Glenn White are: (1) breach of

---

[1]    The last names of the homeowners who originally filed claims with the AAA are Galarneau, Egan, Gill, Hanway, and Hoff.  (See Doc. No. 25-11.)  In the parties' filings, they refer to these initial claims as the "Galarneau Claims."  The Court will do likewise.

contract; (2) violation of the Pennsylvania Real Estate Disclosure Law, 68 PA. CONS. STAT. §

7308; (3) breach of the implied warranties of habitability and workmanlike construction; (4)

negligence; (5) misrepresentation; and (6) violation of the Unfair Trade Practices Consumer

Protection Law ("UTPCPL"), 73 P.S. § 201-1, et seq.

## 2.    Joinder Action

After the Galarneau Claims were brought by the homeowners, Defendant Glenn White

filed a Joinder Arbitration Demand against Defendant Connolly Contractors ("the Joinder

Action") (Doc. No. 25-12).   (See id. at 25.)   Connolly Stucco & Plastering, Inc. ("Connolly

Stucco") "was allegedly the company that did the work on the Project pursuant to a subcontract

with Glenn White."   (See id.)   Because Connolly Stucco & Plastering ceased to exist in 2014,

Glenn White named Defendant Connolly Contractors, Inc. as the successor or assignee to

Connolly Stucco.[2]   (See Doc. No. 1 ¶ 15, 282.)

In the Joinder Action, Glenn White alleges that the homes' "stucco, stone, roof, windows,

doors, decks, electrical systems, HVAC, heating, and plumbing systems, were improperly

constructed or installed . . . "  (Doc. No. 25-12 at 11–12.)  Regarding Connolly Contractors, the

Joinder Action alleges:

> Connolly Stucco's Work performed at Brickhouse Farms is directly implicated by
> the Claimants' allegations in their Demands for Arbitration as Claimants' experts
> alleged that the stucco systems suffered from construction defects, including but
> not limited to, overly thin stucco, over stuccoing of weep screeds, lack of
> expansion or control joints, lack of corner reinforcement, and improperly attached
> lath.

---

[2]    In the Amended Complaint (Doc. No. 7), Plaintiff notes that "Connolly Contractors, which
began operations in 2014, is not the corporate successor-in-interest of Connolly Stucco."
(Doc. No. 7 ¶ 47.)  Defendant Connolly Contractors admitted this in its Answer.  (See Doc.
No. 24 ¶ 47.)  The parties have not yet identified an alternative successor-in-interest for the
record.  However, "such distinction for purposes of this Motion is irrelevant," as "Connolly
[Contractors]," Plaintiff's insured, "has been named in the Joinder Complaint and remains a
party to the Arbitrations."  (Doc. No. 29 at 4.)

(Doc. No. 25-12 ¶ 36.)  The Joinder Action further states that the Galarneau Claims implicate Connolly Contractors because the claims "alleged that the improper construction of the stucco systems led to property damages to the claimants' respective properties."  (Id. ¶ 37.)

In the Joinder Action, Glenn White alleges three claims against Connolly Contractors and several other subcontractors for: (1) contribution for any award in favor of the Galarneau claimants and against Glenn White because Connolly Contractors and the other subcontractors are jointly and severally liable for the damage suffered by the Galarneau claimants; (2) "common law indemnification" from Connolly Contractors and the other subcontractors due to their "primary and active" negligence; and (3) "contractual defense and indemnification" from Connolly Contractors and the other subcontractors arising from their duty to defend and indemnify Glenn White under the subcontracts.  (Id. at 23–25.)

To support these claims, the Joinder Action alleges that Connolly Stucco had two subcontracts with Glenn White.  On July 30, 2005, the parties signed the first subcontract (the "2005 subcontract"), in which Connolly Stucco agreed to "undertake certain obligations," including purchasing general liability insurance.[3]  (Doc. No. 25-1 at 26.)  Additionally, the subcontract included a clause that Connolly Stucco would indemnify and hold harmless Glenn White in the event of loss or damage arising out of Connolly Stucco's work.  (See Doc. No. 25-13 at 5.)  Notably, however, the 2005 subcontract does not require that Glenn White be named as an additional insured on Connolly Stucco's insurance policy with Main Street.  (Doc. No. 25-1 at 6; see also Doc. No. 25-13.)

---

[3]     The subcontract specified that the general liability insurance was to have limits of at least $500,000 per occurrence, or $1,000,000 aggregate.  (See Doc. No. 25-1 at 26.)

4

On February 26, 2007, the parties signed the second subcontract (the "2007 subcontract"), which had "the same insurance and indemnity requirements as did the July 30, 2005 subcontract." (Doc. No. 25-1 at 6; see also Doc. No. 25-14.) Like the 2005 subcontract, the 2007 subcontract did not require that Glenn White be named as an additional insured on the relevant Main Street policies. (See Doc. No. 25-14.)

### 3.    Campbell Claim

On August 9, 2019, Main Street was notified that another AAA arbitration claim was filed against Glenn White. Timothy and Paula Campbell, who owned another home in the Brickhouse Farms development, filed a claim[4] (the "Campbell Claim"), "assert[ing] negligence in construction resulting in property damage to their property." (Doc. No. 25-15 at 2.)

### 4.    Plick Claim

On August 13, 2019, Main Street learned that another action was filed against Glenn White by Robert and Barbara Plick, who also owned a home in the Brickhouse Farms community (the "Plick Claim"). The Plick Claim, filed with the AAA, states that "[t]he [h]omeowners are experiencing moisture penetration and water infiltration events as a result of construction defects." (Doc. No. 25-16 at 4.) The Plicks hired an expert to inspect their home and perform "invasive moisture probe tests." (Id.) As a result, "the [h]omeowners became aware of systemic and latent construction defects in their [h]ome" and cracks in the stucco. (Id.

---

[4]    In its Motion, Main Street offers the following information about the Campbell Claim:

It is Main Street's understanding that the Campbell claim proceeded through AAA arbitration, and that a finding of no liability on the part of Glenn White was entered by the AAA arbitrator. Accordingly, no liability was assessed against Connolly Contractors in that arbitration. It is Main Street's further understanding that the Campbells have appealed that award.

(Doc. No. 25-1 at 29 n.3.)

5

at 5.)  The Plicks allege these defects and cracks caused damage, including water staining on the stucco and microbial growth.  (Id.)  The Plick Claim asserts the following causes of action: (1) breach of contract; (2) breach of the implied warranty of habitability; (3) breach of the implied warranty of workmanship; (4) negligence; and (5) negligent misrepresentation.  (See id. at 5.)

### 5.    The Subsequent Claims and Joinder Actions

After receiving notice of the Plick and Campbell Claims, Main Street learned that sixteen other homeowners in the Brickhouse Farms development filed AAA arbitration claims against Glenn White (the "Subsequent Claims").  (See Doc. No. 7 ¶¶ 64.)  Glenn White in turn filed joinder actions in the AAA proceedings against Connolly Contractors "in connection with some or all of the Subsequent Claims" (the "Subsequent Joinder Actions").  (Id. ¶ 65.)  The allegations against Connolly Contractors in the Subsequent Joinder Actions (Doc. Nos. 25-17, 25-18, 25-19) are identical to those made in the original Joinder Action (collectively, the "Joinder Actions"). (See Doc. No. 25-12.)

### B.    Insurance Policies

### 1.    Businessowners Policies

From August 24, 2015 to August 24, 2019, Plaintiff Main Street issued four businessowners' insurance policies (collectively, the "Businessowners Policies") to Defendant Connolly Contractors:

(a) Main Street Policy Number MPU9531P, which had effective dates of August 24, 2015 to August 24, 2016 (the "2015 Businessowners Policy");

(b) Main Street Policy Number MPU9531P, which had effective dates of August 24, 2016 to August 24, 2017 (the "2016 Businessowners Policy");

(c) Main Street Policy Number MPU8041R, which had effective dates of August 24, 2017 to August 24, 2018 (the "2017 Businessowners Policy"); and

(d) Main Street Policy Number MPU8041R, which had effective dates of August 24, 2018 to August 24, 2019 (the "2018 Businessowners Policy").

(Doc. No. 25-1 at 5.)  Connolly Contractors, Inc. is the named insured on the policies.  (Doc. No. 25-2 at 8.)   The Declaration Page for each policy classifies Connolly Contractors as a "corporation."  (See id.)  An "insured" is defined as follows:

> **C. Who Is An Insured**
> 1. If you are designated in the Declarations as:
>
>                  \*       \*       \*
>
>    d. An organization other than a partnership, joint venture or limited liability company, you are an insured.  Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors.  Your stockholders are also insureds, but only with respect to their liability as stockholders.

(Doc. No. 25-2 at 62.)  To qualify as an "additional insured" under the Businessowners Policies, the "additional insured" must fall within the following definition:

> **A.  Additional Insureds:**
>
>                  \*       \*       \*
>
> 1. Any person(s) or organization(s) for whom you are performing operations is also an additional insured, when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy.  Such person or organization is an additional insured only with respect to liability for . . . "property damage" . . . caused in whole or part, by:
>
>    a.  Your acts and omissions; or
>    b.  The acts or omissions of those acting on your behalf;
>
> In the performance of your ongoing operations or "your work" included within the "products-completed operations" hazard for the additional insured at the

> location designated and described in the written
> contract or agreement.

(Doc. No. 25-3 at 17) (emphasis added).  Thus, to qualify as an "additional insured," the Policies require that the insured and the additional insured have an agreement in writing that the latter will be added as an "additional insured" on the relevant policy.

The pertinent Businessowners Liability coverage, which was in all four policies, provides in part:

**1. Business Liability**

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury," "property damage" or "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury," "property damage" or "personal and advertising injury" to which this insurance does not apply.  We may at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result . . . .

    b. This insurance applies:

    (1) To "bodily injury" and "property damage" only if:

      (a) The bodily injury" or "property damage" is caused by an "occurrence" that takes place in a "coverage territory";
      (b) The "bodily injury" or "property damage" occurs during the policy period . . . .

(Doc. No. 25-2 at 53.)  The Policies define "occurrence" and "property damage" as follows:

    13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\* \* \*

    17. "Property damage" means:

8

   a.  Physical injury to tangible property, including all resulting
       loss of use of that property.  All such loss of use shall be
       deemed to occur at the time of the physical injury that caused
       it; or

   b.  Loss of use of tangible property that is not physically
       injured.  All such loss of use shall be deemed to occur at the
       time of the "occurrence" that caused it.

(Id. at 65–66.)  Thus, to be afforded coverage under the Businessowners Policies for property

damage, the Policies require that the damage in the underlying claim be the result of an

"occurrence."  The policies also feature several exclusions that bar coverage.[5]

   Additionally, under a section titled "Pennsylvania Changes–Defense Costs," the

Businessowners Policies permit Main Street to seek reimbursement from the insured for defense

costs if it is determined that none of the claims in the underlying actions are covered, under the

following terms:

   If we initially defend an insured or pay for an insured's defense but
   later determine that none of the claims, for which we provided a
   defense or defense costs, are covered under this insurance, we have
   the right to reimbursement for the defense costs we have incurred.

   The right to reimbursement under this provision will only apply to
   the costs we have incurred after we notify you in writing that there
   may not be coverage and that we are reserving our rights to
   terminate the defense or the payment of defense costs and to seek
   reimbursement for defense costs.

---

[5]  The pertinent exclusions would bar coverage for: (1) contractual liability, defined as
"'[b]odily injury' or 'property damage' for which the insured is obligated to pay damages by
reason of the assumption of liability in a contract or agreement;" (2) certain types of property
damage arising out of the insured's work product, including property damage to "[t]hat
particular part of any property that must be restored, repaired or replaced because 'your
work' was incorrectly performed on it," property damage caused by the insured's installation
of a building's "exterior insulation and finish systems," and property damage to "impaired
property that has not been physically injured, arising out of a defect, deficiency, inadequacy
or dangerous condition in 'your product' or 'your work;'" and (3) property damage caused by
any "'fungi' or bacteria on or within a building or structure."  (Doc. Nos. 25-2 at 41, 55, 58,
59, 66–68, 25-3 at 19, 42–43.)

(Id. at 43.)

### 2.    Umbrella Policies

In addition to the Businessowners Policies, Plaintiff issued two commercial umbrella insurance policies to Connolly Contractors (collectively, the "Umbrella Policies").  (See Doc. No. 25-1 at 21.)  The Umbrella Policies had effective dates of August 24, 2015 to August 24, 2016 (the "2015 Umbrella Policy"); and August 24, 2016 to August 24, 2017 (the "2016 Umbrella Policy").  The Umbrella Policies provided coverage for property damage, in relevant part, as follows:

> 2.    Insuring Agreement
>
> a.  We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking damages for such "bodily injury" or "property damage" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted.  When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or property damage" to which this insurance does not apply.  At our discretion, we may investigate any "occurrence" that may involve this insurance and settle any resultant claim or "suit" for which we have the duty to defend. . . .
>
> c.   This insurance applies to "bodily injury" and "property damage" only if:
>
>> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
>>
>> (2) The "bodily injury" or "property damage" occurs during the policy period . . . .

(Doc. No. 25-8 at 18.)

10

Like the Businessowners Policies, the Umbrella Policies issued to Connolly Contractors apply to "property damage" only if the damage is caused by an "occurrence" which has the same definition as set forth in the Businessowners Policies.[6]  (Id.)  Further, the Umbrella Policies provide that "[a]ny additional insured under any policy of 'underlying insurance,'" such as the Businessowners Policies, "will automatically be an insured under this insurance."  (Id. at 28.)

### C.    Claims for Coverage

After Glenn White filed the Joinder Action against Connolly Contractors in relation to the Galarneau Claims, Connolly Contractors tendered the Joinder Action to Main Street and sought a defense and indemnity under the Businessowner Policies and the Umbrella Policy (collectively, the "Policies").  (See Doc. No. 25-1 at 30–31.)  While Main Street agreed to assume the defense of Connolly Contractors in the Joinder Action filed against it by Glenn White for the Galarneau Claims, as well any future joinder actions for the "Additional Claims,"[7] it did so subject to a reservation of rights, as set forth in several letters.  (See Doc. No. 25-20.)  In the letters, Main Street noted that several exclusions in the Policies may apply to the Joinder Action and therefore may preclude coverage.  (See id.)  Additionally, the letters noted that pursuant to the "Pennsylvania Changes–Defense Costs" endorsement, Main Street is permitted to seek reimbursement from Connolly Contractors for attorney's fees expended by Main Street in Connolly Contractors' defense.  (See id.)  Pursuant to its reservation of rights, Main Street "has

---

[6]    The Umbrella Policies contain the same relevant exclusions to coverage described in note 5 supra, with the same language and definitions, except for the exclusion regarding installation of exterior insulation and finish systems.  (Id. at 19, 21–22, 38.)

[7]    The Reservation of Rights Letter (Doc. No. 25-20) states that Main Street will also continue to provide a defense and indemnity for additional claims filed by homeowners subsequent to the Galarneau Claims, such as the Campbell, Plick, and Subsequent Claims.  (Id. at 19–20.)

continued to investigate and defend Connolly Contractors in connection with [the] Campbell Claim, the Plick Claim, and the Subsequent Claims."  (Doc. No. 25-1 at 32.)

Further, Glenn White sought coverage from Main Street as an additional insured under Connolly Contractors' Policies.  (Doc. No. 7 ¶ 60, 73, Doc. No. 15 ¶ 73.)  In response, Main Street denied a duty to indemnify and defend Glenn White.  (Doc. No. 7 ¶ 74, Doc. No. 15 ¶ 74.)

### D.     Present Action

On September 13, 2019, Plaintiff filed its original Complaint (Doc. No. 1), and sought a declaratory judgment that it has no duty to defend or indemnify Connolly Contractors in the Galarneau Claims, the Campbell Claim, the Plick Claim, the Subsequent Claims, or the Joinder Actions.  (See Doc. No. 1 at 22, 27.)  The original Complaint named Connolly Contractors as the only Defendant.  (See id. at 4.)  With leave of Court, Main Street filed an Amended Complaint with the same claims but added Glenn White as a defendant.  (See Doc. No. 7.)  Thus, Plaintiff now seeks a declaratory judgment that it has no duty to defend or indemnify either Defendant.

On September 18, 2020, Defendant Glenn White filed a Motion to Dismiss for Lack of Jurisdiction (Doc. No. 10).  In the Motion, Defendant argues that state law on what constitutes an "occurrence" was "uncertain or undetermined," and that an analysis of the case under the factors set forth in Reifer v. Westport Insurance Corporation, 751 F.3d 129 (3d Cir. 2014) required the Court  to decline jurisdiction over the case.  (Doc. No. 10 at 3.)  On November 16, 2020, the Court issued an Opinion and Order (Doc. Nos. 13, 14) denying Defendant's Motion to Dismiss, finding that the Court had jurisdiction over the case under the Federal Declaratory Judgment Act because an analysis of the Reifer factors supports federal jurisdiction over the case.  (Doc. No. 13 at 5.)  In doing so, the Court held that the meaning of "occurrence" under Pennsylvania state

law "has been routinely addressed and settled in Pennsylvania state courts," and was properly within the Court's jurisdiction.[8]  (Id.)

On July 2, 2021, Plaintiff Main Street filed the instant Motion for Judgment on the Pleadings (Doc. No. 25).  On August 4, 2021, Defendant Connolly Contractors filed its Response (Doc. No. 29), and on August 6, 2021, Defendant Glenn White filed its Response (Doc. No. 31).  On August 27, 2021, Plaintiff filed a Reply (Doc. No. 36).  The matters raised in the Motion for Judgment on the Pleadings (Doc. No. 25) are now fully briefed by the parties and ripe for disposition.

## III.   STANDARDS OF REVIEW

### A.   Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  FED. R. CIV. P. 12(c).  In deciding a motion for judgment on the pleadings, a court must consider only those documents contained in the pleadings.  See Moco Invs., Inc. v. United States, 362 F. App'x 305, 307 n.4 (3d Cir. 2010) (explaining that district court's consideration of documents outside the pleadings converted the motion for judgment on the pleadings into a motion for summary judgment).  A motion for judgment on the pleadings is analyzed under the same standard as a motion to dismiss under Federal Rule of Civil Procedure

---

[8]   As the Court noted in the previous Opinion:

> Glenn White additionally argues that we should abstain from hearing this case because it involves unsettled Pennsylvania state law.  We disagree.  At issue is the meaning of "occurrence" in the relevant insurance policies.  According to Glenn White, the issue is unsettled in Pennsylvania, but, in fact, the issue has been routinely addressed and settled in Pennsylvania state courts.  "Federal courts are, of course, perfectly capable of applying state law."  Reifer, 751 F.3d at 148.

(Doc. No. 13 at 5.)

12(b)(6).  See Spruill v. Gillis, 372 F.3d 218, 223 n.2 (3d Cir. 2004) (explaining that "there is no material difference in the applicable legal standards" for Rule 12(b)(6) and Rule 12(c) motions).

Like a motion to dismiss, "[u]nder Rule 12(c), judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." Rosenau v. Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008) (quoting Jablonski v. Pan Am. World Airways, Inc., 863 F.2d 289, 290 (3d Cir. 1988)). The Court "accept[s] as true all allegations in plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and [the court] construes them in a light most favorable to the non-movant." Id. (alteration in original) (quoting Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018); Sheridan v. NGK Metals Corp., 609 F.3d 239, 262 n.27 (3d Cir. 2010)).

### B.    Insurance Policy Interpretation

In Pennsylvania, if the language of an insurance policy is "clear and unambiguous, a court is required to give effect to that language." Prudential Prop. & Cas. Ins. Co. v. Sartno, 903 A.2d 1170, 1174 (Pa. 2006) (quoting Gene & Harvey Builders, Inc. v. Pa. Mfrs. Ass'n Ins. Co., 517 A.2d 910, 913 (Pa. 1986)).  But "[w]here a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement." Id. (quoting Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983)).  "Contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." Id.

### C.    Insurer's Duty to Defend

Under Pennsylvania law, insurers have "a broad duty to defend lawsuits brought against those they insure." Vitamin Energy, LLC v. Evanston Ins. Co., No. 20-3461, 2022 WL 39839, at *1 (3d Cir. Jan. 5, 2022).  In determining whether an insurer has a duty to defend its insured,

Pennsylvania follows the "four corners" rule, which requires that courts compare "the four corners of the insurance contract to the four corners of the complaint." Lupu v. Loan City, LLC, 903 F.3d 382, 389 (3d Cir. 2018) (quoting Am. & Foreign Ins. Co. v. Jerry's Sports Ctr., Inc., 2 A.3d 526, 541 (Pa. 2010)). "[T]he factual allegations of the underlying complaint against the insured are to be taken as true and liberally construed in favor of the insured," and a court must "look to the facts alleged in the underlying complaint, not the cause of action pled." Post v. St. Paul Travelers Ins. Co., 691 F.3d 500, 517 (3d Cir. 2012) (quoting Frog, Switch & Mfg. Co. Inc. v. Travelers Ins. Co., 193 F.3d 742, 746 (3d Cir. 1999) (emphasis omitted)); QBE Ins. Corp. v. M & S Landis Corp., 915 A.2d 1222, 1225 (Pa. Super. 2007)) (internal quotations omitted). Therefore, "if the factual allegations of the complaint on its face encompass an injury that is actually or potentially within the scope of the policy," the insurer has a duty to defend. Id. (quoting Am. & Foreign Ins. Co., 2 A.3d at 541).

### D.    Insurer's Duty to Indemnify

An insurer's duty to indemnify is different from, though related to, its duty to defend. Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co., 939 F.3d 243, 249 (3d Cir. 2019). "Because an insurer's duty to defend its insured in a lawsuit is broader than its duty to indemnify, it necessarily follows that it will not have a duty to indemnify an insured for a judgment in an action for which it was not required to provide defense." Ramara, Inc. v. Westfield Ins. Co., 814 F.3d 660, 673 (3d Cir. 2016).

## IV.    ANALYSIS

### A.    Main Street Has No Duty to Defend Connolly Contractors or Glenn White

Here, Main Street has no duty to defend Connolly Contractors or Glenn White because the underlying actions for which Defendants seek a defense and indemnity do not trigger coverage under the Policies. First and foremost, for the reasons that follow, the claims in all of

the underlying homeowner actions against Glenn White, and Glenn White's Joinder Actions against Connolly Contractors, concern faulty workmanship that is not an "occurrence" under Pennsylvania law or the definition of "occurrence" as set forth in the Policies.  Second, Glenn White is not an additional insured under the Policies Connolly Contractors had with Main Street.

### 1.  Definition of "Occurrence"

The main issue raised in this declaratory judgment action is whether the property damage alleged in the homeowners' claims and the Joinder Actions was caused by an "occurrence."  To find that Plaintiff has a duty to defend Defendants in the underlying actions, the property damage at issue must have been caused by an "occurrence" as defined in the policy and under Pennsylvania law to trigger coverage.  As set forth above, the Policies define "occurrence" as:

> "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

(Doc. No. 25-2 at 65–66.)

Pennsylvania law is well-settled that actions arising from faulty workmanship do not allege an "occurrence."  Two leading cases and their progeny have cemented this rule.  The leading cases are Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Com. Union Ins. Co., 908 A.2d 888 (Pa. 2006) and Millers Cap. Ins. Co. v. Gambone Bros. Dev. Co., 941 A.2d 706, 708 (Pa. Super. 2007).  The Court will summarize the facts and holdings of these cases in turn.

In the seminal Kvaerner decision, the Pennsylvania Supreme Court held that an insurer had no duty to defend or indemnify its insured when the underlying suit "aver[red] only property damage from poor workmanship to the work product itself."  Kvaerner, 908 A.2d at 900.  The insured plaintiff, a coke battery builder, sued its insurer in a declaratory judgment action alleging that it was entitled to defense and indemnity in an action brought against it by Bethlehem Steel Corporation.  Similar to the issue here, the decision of whether there was coverage in that case

turned on whether the underlying claim alleged an "occurrence."   The policy's definition of "occurrence" was the same one as the definition of "occurrence" in the Policies here: "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[9]  Id. at 897.   The underlying complaint alleged breach of contract because the battery that plaintiff built "was 'damaged' and 'did not meet the contract specifications and warranties, or the applicable industry standards for construction[].'"  Id. at 891.

Consulting the dictionary definition of "accident," which is defined as "[a]n unexpected and undesirable event," or "something that occurs unexpectedly or unintentionally," the Pennsylvania Supreme Court held:

> We hold that the definition of "accident" required to establish an "occurrence" under the policies cannot be satisfied by claims based upon faulty workmanship. Such claims simply do not present the degree of fortuity contemplated by the ordinary definition of "accident" or its common judicial construction in this context.  To hold otherwise would be to convert a policy for insurance into a performance bond.  We are unwilling to do so, especially since such protections are already readily available for the protection of contractors.

Id. at 897–99 (citing WEBSTER'S II NEW COLLEGE DICTIONARY 6 (2001)).  The court in Kvaerner came to this conclusion after drawing on decisions from other jurisdictions, in both federal and state court, that had the same holdings.  See id. at 898–99.   Additionally, the Pennsylvania Supreme Court held that the policy's definition of occurrence was unambiguous.  See id. at 899.

Shortly after the Kvaerner decision, the Pennsylvania Superior Court decided Millers Cap. Ins. Co. v. Gambone Bros. Dev. Co., 941 A.2d 706 (Pa. Super. 2007).  The facts and underlying claims in Gambone are analogous to those at hand.  There, the insured was a real

---

[9]   This is the exact same language that has been analyzed by courts in the Third Circuit and Pennsylvania in the decisions discussed infra, including Gambone, Specialty Surfaces, and Pottstown Industrial.  In all of those cases, the relevant policies also defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

estate firm that "develop[ed] and buil[t] housing developments," as well as developed other types of real estate.  Id. at 708.  The underlying claims alleged faulty construction due to water leaks that were the result of, among other causes, faulty installation of stucco on the exterior of homes.[10]  Id. at 709.  In support of coverage, Gambone, the insured, argued that the underlying claims alleged property damage caused by an "occurrence" because they "do not merely involve claims for faulty workmanship that led to the failure of the stucco exteriors but also involve claims for ancillary and accidental damage caused by the resulting water leaks to non-defective work inside the home interiors."  Id. at 713.  Further, Gambone attempted to distinguish the Kvaerner decision by asserting that "the resulting water damage [to non-defective work] constitutes an 'occurrence' even though the damage to the faulty stucco exteriors does not."  Id.

The court in Gambone held that "the weight of common sense collapses the distinction Gambone attempts to create."  Id. at 713.  Pointing to Kvaerner, the court noted that "natural and foreseeable acts, such as rainfall, which tend to exacerbate the damage, effect, or consequences caused ab initio by faulty workmanship also cannot be considered sufficiently fortuitous to constitute an 'occurrence' or 'accident' for the purposes of an occurrence based [commercial general liability] CGL policy."  Id. at 713.  Reiterating this point, the court held that "damage caused by rainfall that seeps through faulty home exterior work to damage the interior of a home

---

[10]   As summarized by the Superior Court:

> Both [underlying actions] aver Gambone and/or its subcontractors built homes with defective stucco exteriors, windows, and other artificial seals intended to protect the home interiors from the elements.  Both complaints are based on claims for faulty workmanship.  Both complaints allege that when the defects manifested themselves, water damage resulted to the interior of the larger product—in this case, the home interiors.

Gambone, 941 A.2d at 713.

is not a fortuitous event that would trigger coverage." Id. at 714. Put differently, the Superior Court rejected the argument that damage to non-defective work in the interior of the home was an "occurrence," as the damage to the non-defective work was still caused by faulty workmanship.[11]

The United States Court of Appeals for the Third Circuit has relied upon the holdings of these cases in deciding whether there is a duty to defend under occurrence-based policies. See, e.g., Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co., 609 F.3d 223, 227 (3d Cir. 2010). In Specialty Surfaces, the Third Circuit affirmed the district court's holding that an insurer had no duty to defend because the underlying claims were based on faulty workmanship in installing synthetic turf at high school playing fields. The Third Circuit held that this faulty workmanship was not an "occurrence." Id. at 239. In pursuit of coverage, the insured insisted that the facts differed from those in Gambone because "the plaintiffs there did not allege damage beyond the structure of the house, which was the work product of the insured." Id. The insured argued in Specialty Surfaces that its faulty installation of synthetic turf was a separate project from the installation of a subgrade underneath the field, which was installed by another entity. Id. at 238. Thus, the insured alleged that damage to the subgrade caused by faulty installation of turf was an "occurrence," because the subgrade was not the insured's own work Id. Nevertheless, the Third Circuit held:

> This argument, however, ignores that the Gambone Court, following Kvaerner, clearly focused on whether the alleged damage was caused by an accident or

---

[11] As the court in Gambone held:

> To reiterate, damage caused by rainfall that seeps through faulty home exterior work to damage the interior of a home is not a fortuitous event that would trigger coverage.

Gambone, 941 A.2d at 714.

unexpected event, or was a foreseeable result of the faulty workmanship when deciding whether the policy covered the damage.  Here, water damage to the subgrade was a foreseeable result of the failure to supply a suitable liner or "to ensure the proper design, manufacture and installation of the synthetic turf and subdrain system."  JA 619.  Accordingly, we believe the District Court properly predicted that the Pennsylvania Supreme Court would decide that Continental did not have a duty to defend Sprinturf in the California litigation.

Id. at 239.  Furthermore, the Third Circuit made clear:

In order for a claim to trigger coverage, there must be a causal nexus between the property damage and an "occurrence," i.e., a fortuitous event.  Faulty workmanship, even when cast as a negligence claim, does not constitute such an event; nor do natural and foreseeable events like rainfall.

Id. at 231.

In numerous decisions interpreting Pennsylvania law, the Third Circuit and district courts have denied a duty to defend under occurrence-based policies in cases with similar claims of faulty workmanship.  See, e.g., Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co., 939 F.3d 243, 256 (3d Cir. 2019) ("For the nineteen policies that contain the Accident Definition of "occurrence," under Kvaerner and Specialty Surfaces, Marvin's allegations—which, at their core, are solely for faulty workmanship—do not trigger coverage.") (citation omitted); Main St. Am. Assurance Co. v. Howard Lynch Plastering, Inc., 21-3977, 2022 WL 445768, at *5 (E.D. Pa. Feb. 14, 2022) (holding under Pennsylvania law that insurer had no duty to defend or indemnify insured regarding underlying homeowner claims, which alleged construction defects such as improper installation of stucco, because the damage did not arise from an "occurrence"); Atain Ins. Co. v. Basement Waterproofing Specialists, Inc., No. 20-5440, 2021 WL 5139903, at *6 (E.D. Pa. Nov. 3, 2021) (holding under Pennsylvania law that insurer had no duty to defend or indemnify underlying claims of breach of contract, negligence, statutory and common law fraud and misrepresentation, and breach of the covenant of good faith and fair dealing because such claims alleged faulty workmanship and thus did not arise from an "occurrence"); Westfield Ins. Co. v.

20

Bellevue Holding Co., 856 F. Supp. 2d 683, 702 (E.D. Pa. 2012) ("Under well-established Pennsylvania law, claims of and damage resulting from faulty workmanship do not have a sufficient degree of fortuity contemplated by the ordinary definition or common judicial construction of the term 'accident.'").

### 2.    Underlying Actions Do Not Allege an "Occurrence"

Here, a careful review within the "four corners" of the underlying claims demonstrates that they are premised entirely upon faulty workmanship.  In the underlying homeowner actions, the claimants have alleged the following claims that resulted in property damage: (1) negligence; (2) breach of contract; (3) breach of the implied warranty of habitability; (4) breach of the implied warranty of workmanlike construction; (5) violation of the Pennsylvania Real Estate Disclosure Law, 68 PA. CONS. STAT. § 7308; (6) misrepresentation; (7) negligent misrepresentation; and (8) violation of the Unfair Trade Practices Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1, et seq.  Further, the Joinder Actions allege the following claims against Connolly Contractors: (1) contribution; (2) common law indemnification; (3) contractual defense and indemnification.

In the Galarneau, Campbell, Plick, and Subsequent Claims, the moisture penetration in the homes are alleged, in every respect, to be caused by construction defects.  (Doc. Nos. 25-1 at 24, 25-15 at 2, 25-16 at 4.)  For example, in the Galarneau Claims, the homeowners allege in the critical paragraph of their Arbitration Demand:

> A moisture inspection of the Property was performed by Shield & Compass Agency, LLC revealing moisture penetration indicative of pervasive defects in the construction of the Property.  At that time, Claimant[s] discovered that the labor and materials provided by [Glenn White] and their subcontractors did not comply with Federal, State, and local building codes, industry standards, the aforementioned marketing materials, written contracts, and warranties.

(Doc. No. 25-11 at 5.)  These allegations are repeated in the Plick Claim, where the homeowners allege that "[a]s a result of invasive moisture probe tests, the [Plicks] became aware of systemic and latent construction defects in their home," and assert that:

> Glenn White failed to properly retain and supervise qualified contractors and/or subcontractors, constructing the Home, and/or inspect and verify that construction was in accordance with appropriate building codes, industry standard, and manufacturers' installation instructions.

(Doc. No. 25-16 at 4–5.)  Accordingly within the "four corners" of these underlying complaints filed by the homeowners against Glenn White, are allegations of faulty workmanship, not a fortuitous event.

The fact that the underlying complaints are based upon claims of faulty workmanship is corroborated by the resulting Joinder Actions that Glenn White filed against Connolly Contractors:

> Connolly Stucco's Work performed at Brickhouse Farms is directly implicated by the Claimants' allegations in their Demands for Arbitration as Claimants' experts alleged that the stucco systems suffered from construction defects, including but not limited to, overly thin stucco, over stuccoing of weep screeds, lack of expansion or control joints, lack of corner reinforcement, and improperly attached lath.

(Doc. No. 25-12 ¶ 36.)  Thus, Glenn White's complaints against Connolly Contractors also are based on faulty workmanship in the installation of the stucco for the Project.  Under Kvaerner, Gambone, and Third Circuit precedent, these circumstances are not fortuitous, do not amount to an "occurrence," and do not trigger the Policies' duty to defend.

Bearing in mind that "it is the nature of the allegations themselves, not the particular cause of action that is pled in the complaint that determines whether coverage has been triggered," courts in the Third Circuit have denied the existence of an "occurrence" when the underlying claims asserted causes of action similar to those asserted in this case that were

ultimately premised upon faulty workmanship.  Utica Mut. Ins. Co. v. Voegele Mech., Inc., 418 F. Supp. 3d 78, 91 (E.D. Pa. 2019).

First, the homeowners assert the causes of action of negligence and negligent representation, as stated in the Galarneau, Campbell, and Plick Claims, constitute "occurrences." Merely because these claims are for negligence does not mean that they are per se accidents within the Policies' meaning of "occurrence."   As noted by the Third Circuit, "[f]aulty workmanship, even when cast as a negligence claim, does not constitute such an event" to trigger the definition of "occurrence."  Specialty Surfaces Int'l, Inc., 609 F.3d at 231.  Therefore, casting such claims as one for negligence does not alone give rise to a duty to defend.[12]

Second, several of the homeowner actions against Glenn White are for breach of contract and breach of the implied warranty of habitability and workmanlike construction.  "Pennsylvania law does not recognize the applicability of a general liability policy to breach of contract and breach of warranty claims."  Nationwide Mut. Ins. Co. v. CPB Int'l, Inc., 562 F.3d 591, 597 (3d Cir. 2009) (citing Pennsylvania Mfrs.' Ass'n Ins. Co. v. L.B. Smith, Inc., 831 A.2d 1178, 1181 (Pa. Super. 2003) (internal quotation marks omitted)).  The reason for this is that "[t]he purpose and intent of a general liability insurance policy is to protect the insured from essentially accidental injury to the person or property of another rather than coverage for disputes between parties to a contractual undertaking."  L.B. Smith, Inc., 831 A.2d at 1181.

Third, the homeowners also assert claims for misrepresentation, violation of the Pennsylvania Real Estate Disclosure Law, 68 Pa. Cons. Stat. § 7308,[13] and violation of the

---

[12]   A court must "look to the facts alleged in the underlying complaint, not the cause of action pled."  Post v. St. Paul Travelers Ins. Co., 691 F.3d 500, 517 (3d Cir. 2012).

[13]   Section 7308 states in relevant part:

Unfair Trade Practices Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1, et seq.[14]  These causes of action involve intentional misrepresentation or fraud.  "Because fraud is an intentional act, these claims are also not covered occurrences."  Atain Ins. Co. v. Basement Waterproofing Specialists, Inc., No. 20-5440, 2021 WL 5139903, at *8 (E.D. Pa. Nov. 3, 2021) (citations omitted).  See also Bituminous Cas. Corp. v. John W. Gleim, Jr., Inc., No. 07-2287, 2009 WL 473034, at *4 (M.D. Pa. Feb. 24, 2009) (holding that intentional acts, including fraud, were not covered by an occurrence-based policy and noting that "both Pennsylvania state courts and federal courts applying Pennsylvania law have held that intentional acts, including intentional misrepresentations, are not covered as 'occurrences' under a general liability insurance policy").

In any event, what is decisive here is the nature of the allegations.  See Post v. St. Paul Travelers Ins. Co., 691 F.3d 500, 517 (3d Cir. 2012).  And as noted, at their core, the allegations assert faulty workmanship by Defendants that caused pervasive moisture penetration in the homes.

Thus, the facts in the underlying cases do not allege "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (Doc. No. 25-2 at 65–66.)  Moreover, it is reasonably foreseeable that Defendants' faulty installation of stucco and other items as part of the Project would result in damage to the homes, such as moisture penetration and further water damage.  And the damage alleged was to the Project itself that Defendants contracted to build—the houses, which is the distinguishing factor that renders

---

> [T]he seller shall not make any representations that the seller or the agent for the seller knows or has reason to know are false, deceptive or misleading and shall not fail to disclose a known material defect.

68 PA. CONS. STAT. § 7308.  The Court construes this claim also as one of misrepresentation.

[14]  "The UTPCPL's underlying foundation is fraud prevention."  Weinberg v. Sun Co., 329 A.2d 442, 446 (Pa. 2001) (citation and quotation marks omitted).

Pottstown Industrial, discussed infra, inapplicable here.   Further, as held by the Pennsylvania

Supreme Court in Kvaerner and noted in Gambone, which analyzed the same policy definition of

"occurrence," the policy language is unambiguous and must be given effect.   "When policy

language is unambiguous, we give effect to that language."   Gambone, 941 A.2d at 712 (citing

Kvaerner, 908 A.2d at 897).   Hence, since the property damage alleged is not based upon an

"occurrence," coverage is not triggered under the Policies, and the Court will issue a declaratory

judgment that Main Street does not have a duty to defend and indemnify Defendants Glenn

White and Connolly Contractors in the underlying actions.[15]

### 3.     There is No Duty to Defend Under the Insurance Policies

In their defense, Defendants Glenn White and Connolly Contractors have argued that the

facts giving rise to the underlying claims do, in fact, constitute an "occurrence."   In its Response

(Doc. No. 31), Defendant Glenn White points to a case from the Pennsylvania Superior Court,

Pennsylvania Manufacturers Indemnity Company v. Pottstown Industrial Complex, L.P., 215

A.3d 1010 (Pa. Super. 2019).   There, the insured was a landlord who "fail[ed] to properly

maintain and repair the roof" at a property where a tenant housed over $700,000 in inventory.   Id.

at 1012.   Flooding occurred and damaged the inventory at the property.   See id.   In turn, the

tenant attributed the damage to the landlord's failure to maintain the premises.   See id.   The

landlord subsequently sought coverage from its insurer under an occurrence-based policy.   Id. at

1013.

In reversing the trial court's judgment that the insurer had no duty to defend, the

Superior Court in Pottstown Industrial recited precedent, such as Kvaerner and Gambone, noting

that under Pennsylvania law, an underlying claim "does not allege an 'occurrence' where the

---

[15]   Because Plaintiff does not have a duty to defend Defendants, this Court need not discuss
whether the relevant exclusions in the Policies, see supra note 5, apply to bar coverage.

only property damaged is the product or property that the insured supplied or on which it worked

or where the damages sought are for the insured's failure to deliver the product or perform the

service it contracted to provide." Id. at 1015.  The Superior Court distinguished these situations

from the one in Pottstown Industrial:

> These precedents, however, do not hold that the fact that liability is based on
> failure to properly perform contractual duties precludes the existence of an
> "occurrence" where the claim is for damage to property not supplied by the
> insured and unrelated to what the insured contracted to provide.

Id. at 1015–16.  Holding that the underlying action in that case did allege property damage

caused by an "occurrence," because the damaged inventory was "other property" and "not

property that [the landlord] contracted to provide," the Superior Court acknowledged that facts of

faulty workmanship akin to Gambone still are not an "occurrence" under Pennsylvania law:

> In Gambone Brothers, this Court held that claims for water damage to houses that
> the insured had constructed did not allege an "occurrence" and were therefore not
> covered by its liability insurance policies.  941 A.2d at 708, 713–14.  The Court
> held that the claims for damage to the houses were indistinguishable from the type
> of claim in Kvaerner because they alleged faulty workmanship and damage to the
> insured's products themselves, the houses.  Id. at 713.

Id. at 1016.

Here, using Pottstown Industrial, Defendant Glenn White asserts that "an 'occurrence' is

present because the damage alleged in the instant case occurred to "other property"—"other

elements of the house structure and the completed home." (Doc. No. 31-1 at 10.) Glenn White's

reliance on this decision is not convincing for several reasons.  First, the facts of Pottstown

Industrial are distinguishable.  Unlike in that case, where damage was to inventory housed within

an insured landlord's property, the underlying actions here "allege[] faulty workmanship and

damage to [Defendants'] products themselves, the houses." Pottstown Industrial, 215 A.3d 1016.

Even if the faulty workmanship alleged caused damage to non-defective portions of the home

structure, this still does not constitute an "occurrence," as this argument was raised in, and squarely rejected by the Superior Court, in Gambone, a decision that Pottstown Industrial distinguished from its case.

Additionally, as held by other district courts within the Third Circuit, Pottstown Industrial "did not modify the long-standing rule regarding coverage for faulty workmanship claims" in Pennsylvania, as Plaintiff notes in its reply.  (Doc. No. 36 at 6 (citing Evanston Ins. Co. v. Tristar Prod., Inc., 537 F. Supp. 3d 798, 814 (E.D. Pa. 2021) (distinguishing Pottstown Industrial and holding "any distinction between damage to the [insured's] work product alone versus damage to other property is irrelevant so long as both foreseeably flow from faulty workmanship") (citing Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co., 939 F.3d 243, 249 (3d Cir. 2019)))).  See also Zurich Am. Ins. Co. v. Century Steel Erectors Co., L.P., No. 19-998, 2020 WL 2065465, at *9 (W.D. Pa. Apr. 14, 2020) (distinguishing Pottstown Industrial).  Because the underlying actions in this case allege that the property damage was caused by faulty workmanship in constructing the homes themselves, like the underlying claimants in Gambone, the Court is not convinced by Glenn White's arguments in opposition.[16]

The arguments in opposition from Connolly Contractors also are unavailing.  In its Response (Doc. No. 29), Connolly Contractors' assert that the underlying actions allege an "occurrence" based on the faulty workmanship of other subcontractors on the Project, which it claims was unforeseeable.  The Response states the following argument:

---

[16]   Defendant Glenn White in its Response also asks the Court to reconsider the issue of jurisdiction that the Court previously ruled upon in its Opinion and Order denying Glenn White's Motion to Dismiss.  (Doc. Nos. 13, 14.)  In the Opinion on the Motion, the Court analyzed the Reifer factors at length and determined that jurisdiction in federal court is proper, inter alia, because Pennsylvania law is well-settled on the issues presented in this case.  (See Doc. No. 13 at 5.)  The Court will decline to repeat its analysis here or to change its decision.

> As alleged in the Joinder Complaint, each of the additional defendant
> subcontractors' actions had a role in causing the alleged damages.   Plaintiff
> painstakingly recites the defaults among the other subcontractors which led to the
> claim.  Each of these actions is an individual non[-]foreseeable event ancillary to
> any workmanship issues.   Such claims trigger coverage as an occurrence[.]   It
> belies logic to even assert that Connolly foresaw that each and every contractor
> would fail to properly execute or negligently perform each task which led to
> "moisture penetration" in the entire residence.   The instant action is
> distinguishable from <u>Gambone</u> as the causes of damages, the acts of every
> subcontractor[,] were not foreseeable to Connolly.

<u>Id.</u> at 5.

Connolly Contractors' argument, however, not only acknowledges that the underlying claims are premised upon faulty workmanship, but propels this fact into the limelight.  At its core, this argument ignores what has been made clear by Pennsylvania courts and courts within the Third Circuit interpreting Pennsylvania law: underlying actions claiming damages caused by faulty workmanship are not fortuitous events that rise to the level of an "occurrence."

### 4.    Glenn White Does Not Qualify as an Additional Insured

Plaintiff has no duty to defend for another reason: Defendant Glenn White is not an additional insured.   As noted above, under Pennsylvania law, an insurer's duty to defend is determined by comparing allegations in the complaint with the relevant policy of insurance. <u>Kvaerner</u>, 908 A.2d at 896.  This is a "four corners" rule, where the four corners of the insurance contract are compared to the four corners of the complaint.  See <u>Lupu v. Loan City, LLC</u>, 903 F.3d 382, 389 (3d Cir. 2018).

Here, the complaints relevant to whether Glenn White is covered as an additional insured under the Policies are the Joinder Actions.  In the Joinder Actions, Glenn White bases its claims for coverage on two subcontracts that it held with Connolly Contractors: (1) the 2005 subcontract; and (2) the 2007 subcontract.   (<u>See</u> Doc. No. 25-12 ¶ 33.)  Specifically, the Joinder Actions allege:

As part of the contracts, Connolly Stucco agreed to "indemnify and hold harmless [Glenn M. White Builders, Inc.] and all of his agents and employees from and against all claims, damages, losses and expenses, including attorneys' fees arising out of or resulting from performance of [Connolly Stucco's] work under this Subcontract, provided that any such claim, damage, loss or expense (a) is attributable to . . . injury to or destruction of tangible property (other than the Work itself) including the loss of use resulting therefrom, and (b) is caused in whole or in part by any negligent act or omission of [Connolly Stucco] or anyone directly or indirectly employed by him or anyone for whose acts he may be liable, regardless of whether it is caused in party by a party indemnified hereunder."

(See id. ¶ 35.)   Notably, however, the Joinder Action does not allege that either of the subcontracts, the 2005 subcontract or the 2007 subcontract, require that Glenn White be named in writing as an additional insured in the Main Street Businessowners Policies. And a review of the subcontracts confirms the absence of an agreement for Glenn White to be added as an additional insured.  (See Doc. Nos. 25-13, 25-14.)

As noted previously, Defendant Connolly Contractors is the named insured on the Policies.  However, another entity may also be covered as an insured if it is an "additional insured."  To qualify as an additional insured, the person or entity must fall within the definition of "additional insured" in the Businessowners Policies and the Umbrella Policies:

Any person(s) or organization(s) for whom you are performing operations is also an additional insured, when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy.

(Doc. No. 25-3 at 17.)  Thus, to qualify as an additional insured and be afforded coverage under the Policies, there must exist in writing a contract between the insured and the purported "additional insured" that the latter will be added as such on the relevant policy.

A contract with this requirement is not alleged to exist by Glenn White in the Joinder Actions.  To circumvent this fact, Glenn White argues in its Response that the parties had two additional subcontracts, one in 2008 and one in 2014, that did require additional insured

29

coverage.  (See Doc. No. 31-1 at 5–8.)  Pursuant to these other subcontracts, Glenn White asserts that it is an additional insured, and that Plaintiff has erroneously omitted the other subcontracts from its filings.  (See id.)

Under the "four corners" rule, however, subcontracts extraneous to the Joinder Actions are immaterial here.  In its claims against Connolly Contractors in the underlying Joinder Actions, Glenn White expressly relies only upon the 2005 and 2007 subcontracts.  In fact, in Glenn White's Answer (Doc. No. 7), it admits that Connolly Contractors' alleged predecessor, Connolly Plastering & Stucco, performed work on the Project only pursuant to the 2005 and 2007 subcontracts, without naming any other subcontracts.  (Doc. No. 7 ¶ 49–55.)  And noted earlier, Glenn White does not allege that these subcontracts contained an additional insured agreement.

Even if other subcontracts exist between the Defendants that contain different terms, the Court must rely upon what Glenn White has alleged in the Joinder Actions to determine whether there is coverage.  Thus, aside from the fact that there is no "occurrence" to trigger coverage for either Defendant, as discussed above, Plaintiff also has no duty to defend Glenn White because it is not an additional insured under its Policies.

### B.   Main Street Has No Duty to Indemnify Either Party

An insurer's duty to indemnify is different from, though related to, its duty to defend. Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co., 939 F.3d 243, 249 (3d Cir. 2019).  "Because an insurer's duty to defend its insured in a lawsuit is broader than its duty to indemnify, it necessarily follows that it will not have a duty to indemnify an insured for a judgment in an action for which it was not required to provide defense."  Ramara, Inc. v. Westfield Ins. Co., 814

F.3d 660, 673 (3d Cir. 2016).   Because Plaintiff has no duty to defend Defendants Connolly

Contractors and Glenn White, it follows that Plaintiff also has no duty to indemnify either party.

### C.    Main Street's Defense Costs

As noted <u>supra</u>, the Businessowner Policies provide that Main Street is entitled to seek

reimbursement for defense costs if it defends an insured and it is later determined that there is no

duty to defend.   Main Street has continued to defend Connolly Contractors pursuant to a

Reservation of Rights.   The Policies provide:

> If we initially defend an insured or pay for an insured's defense but later
> determine that none of the claims, for which we provided a defense or defense
> costs, are covered under this insurance, we have the right to reimbursement for
> the defense costs we have incurred.

(Doc. No. 25-2 at 43.)   This amount is limited to the costs it incurred after Main Street advised

Connolly Contractors in writing of its right to reimbursement.   (<u>See</u> <u>id.</u>)

In its instant Motion (Doc. No. 25), Main Street seeks fourteen (14) days to determine

whether to pursue a claim for reimbursement from Connolly Contractors and to file a submission

with the Court documenting the costs sought.   Because the Court has determined that Plaintiff

has no duty to defend Connolly Contractors, the Court will grant this request.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings (Doc. No.

25) will be granted.   An appropriate order follows.